IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ETHANOL CAPITAL MANAGEMENT, ) | |
| ) | |
| Plaintiff, ) | 4:06CV3176 |
| ) | |
| v. ) | |
| ) | |
| DEWEESE BIOFUELS, and ) | MEMORANDUM AND ORDER ON |
| REPUBLICAN VALLEY ETHANOL, ) | PLAINTIFF'S MOTION FOR A |
| ) | TEMPORARY RESTRAINING ORDER |
| Defendants. ) | |
| ) | |

On July 26, 2006, the plaintiff, Ethanol Capital Management LLC (Ethanol Capital), filed a complaint against Defendants DeWeese BioFuels, L.L.C. (DeWeese) and Republican Valley Ethanol, L.L.C. (Republican Valley), alleging that the defendants breached a contract to sell certain assets to the plaintiff. (See Compl., filing 1.) In an effort to prevent the defendants from selling their assets to a third party before this litigation is resolved, the plaintiff also filed a motion for a temporary restraining order. (See filing 3.) The plaintiff's motion has been briefed, and the parties have appeared before me and argued their positions. (See filing 7.) For the following reasons, I shall deny the plaintiff's motion.

## I.  BACKGROUND

Ethanol Capital is engaged in the business of developing and funding the construction of ethanol plants. (See filing 5, Schwendiman Dec. ¶ 4.) According to Ethanol Capital's Chairman and co-founder, Gary Schwendiman, "there has been an unprecedented boom in the construction of facilities for the production of ethanol in this country" since 2002. (Id. ¶ 5.) As a result of this boom, Fagen Inc. (Fagen), which

1

Schwendiman regards as "the premier design-build contractor for the construction of ethanol plants" and the "favored contractor" of investors, has created a "slot" system to order its business. (See id. ¶¶ 5-6.) A "slot" is essentially an agreement to begin the construction of a new ethanol plant on a specific date. (See id. ¶ 6.) Due to the demand for Fagen's services, new slots cannot be obtained before 2010. (See id.) Furthermore, if the holder of a previously-issued slot should lose that slot, the construction of its plant will be delayed for years. (See id.)

In April 2006, Ethanol Capital learned that DeWeese and Republican Valley held slots for the construction of two Fagen ethanol plants, with construction scheduled to begin in 2007. (See Schwendiman Dec. ¶ 7.) DeWeese and Republican Valley also held "options to purchase two tracts of real estate upon which two ethanol plants could be erected." (Id. ¶ 8.) On April 18, 2006, Clay Rawhouser, a manager of both DeWeese and Republican Valley, met with Schwendiman in Omaha to discuss Ethanol Capital's interest in purchasing the two companies. (See filing 8, Defs.' Ex. 101, Rawhouser Dec. ¶ 5.) According to Rawhouser, "The meeting concluded with Mr. Schwendiman agreeing to develop a term sheet for a proposed transaction, which would be discussed at a second meeting set for April 25, 2006." (Id.)

On April 25, 2006, Schwendiman and an associate traveled to Nelson, Nebraska, to "negotiate the purchase" of the slots and the real estate options. (See Schwendiman Dec. ¶ 8.) It is undisputed that Schwendiman and his party appeared in Nelson and met with Rawhouser, Steve Clabaugh, and Pam Maynard. (See id. ¶ 9.) However, Schwendiman's and Rawhouser's accounts of this meeting differ.

Schwendiman states that Rawhouser, Clabaugh, and Maynard "were represented to be members of both DeWeese and Republican Valley," and Schwendiman was informed that the 2007 Fagen slots and the real estate purchase options were the "only significant assets owned by the companies." (Schwendiman Dec. ¶ 9.) "At one point in the conversation," Schwendiman and his associate left the meeting to allow Rawhouser,

2

Clabaugh, and Maynard to hold a private discussion. (See id. ¶ 10.) After this discussion concluded, Schwendiman was told that DeWeese and Republican Valley would sell their assets to Ethanol Capital for $10,350,000. (See id. ¶ 10.) Notably, Schwendiman claims that he was told that Rawhouser, Clabaugh, and Maynard "represented a majority of the membership interests of DeWeese and Republican Valley and that no additional approval from the membership would be necessary before an agreement could be reached." (See id.)

According to Rawhouser, Schwendiman appeared at the April 25 meeting without the term sheet that was discussed at the April 18 meeting. (See Rawhouser Dec. ¶ 6.)[1] Rawhouser states, "There were wide-ranging discussions about a possible transaction[,] including the form of the transaction and due diligence that would precede any definitive agreement." (Id.) He also states, in direct contrast to Schwendiman's account, that "[t]here were specific discussions at this meeting . . . that approval of the Members of [DeWeese] and [Republican Valley] would be required." (Id.; see also filing 8, Defs.' Ex. 102, Garrison Dec. ¶ 2 ("It was my impression that all of the parties present at the meeting understood that if the transaction proceeded, it would be necessary to prepare a definitive agreement and to obtain the members' approval of that definitive agreement.").) Furthermore, "Mr. Schwendiman was invited to attend the annual meeting of the Members of [DeWeese] to explain his proposed transaction." (Rawhouser Dec. ¶ 6.)

Although the parties disagree about the need for membership approval of the sale, it is undisputed that the Operating Agreements of both DeWeese and Republican Valley contain the following provision:

> Approval of Sale of All Assets. The Members shall have the right, by the affirmative vote of Members holding at least a majority of all Capital Interests, to approve the sale, exchange or other disposition of all, or

---

[1]Schwendiman's declaration makes no mention of the April 18 meeting.

> substantially all, of the Company's assets (other that in the ordinary course of the Company's business) which is to occur as part of a single transaction or plan.

(Rawhouser Dec. ¶ 10; Schwendiman Dec., Ex. 3 at 4, 8. <u>See also</u> Schwendiman Dec., Ex. 3, at 3, 7.)

The parties also agree that before the April 25 meeting concluded, Clabaugh, Rawhouser, and Schwendiman executed a Memorandum of Understanding (MOU) concerning the sale. (<u>See</u> Schwendiman Dec. ¶ 11; Rawhouser Dec. ¶ 6.) The MOU states:

> MEMORANDUM OF UNDERSTANDING
> FOR THE SALE OF ALL ASSETS OF
> DEWEESE BIOFUELS LLC AND REPUBLICAN VALLEY ETHANOL LLC
>
> This Memorandum of Understanding is made and executed this 25th day of April 2006 by and between DeWeese BioFuels LLC and Republican Valley Ethanol LLC, "sellers", and Ethanol Capital Management LLC (ECM), "buyers" for the purchase of one hundred percent (100%) of the stock, units and all other assets of the sellers. Consideration for this purchase shall be the sum of ten million three hundred fifty thousand dollars ($10,350,000.00) payable to the entities herein named as subsequently directed by the sellers. Payment shall be in cash, unless mutually agreed upon by the parties in a form other than cash. This Memorandum of Understanding may not be assigned by the seller nor may be assigned by the buyer except to an affiliate of ECM.
>
> Payment of the consideration by the buyer or one of its designated affiliates and the purchase of the seller and its assets by the buyer is subject to and contingent upon the findings by ECM during the hereby agreed upon 90 day due diligence period for ECM to conduct due diligence that begins the date of this agreement. Buyer may escalate the closing date but it shall terminate on July 25, 2006 at 5:00 p.m. CST. During the 90 day due diligence period, seller shall not execute any binding agreement with regard to the stock units, or assets of sellers.
>
> Subject to the above paragraph, this Memorandum of Understanding shall be binding upon the parties hereto, their personal representatives and

>assigns.  In the event the buyer elects to proceed, the seller agrees to complete a definitive agreement consistent with the terms herein and all other instruments necessary to complete the sale.
>
>Consideration for the execution of this Memorandum of Understanding is the sum of $20.00 receipt of which is hereby acknowledged by the seller.
>
>All parties hereto agree that this agreement will be held in strict confidentiality by the parties hereto but that the same may be disseminated to lawyers, accountants or others who will be likewise bound by this confidentiality agreement.  Buyers may disclose the same to its investors or potential investors and others who may participate in or have need to know regarding the performance of the due diligence who will in turn be bound by this confidentiality agreement.

(Compl., filing 1, Ex. A.)

According to Rawhouser, the parties conversed and exchanged e-mails after the April 25, 2006, meeting, and Mr. Schwendiman was invited to attend DeWeese's annual meeting.  (See Rawhouser Dec. ¶ 7.)  Schwendiman responded to this invitation with an e-mail that states, in part, as follows:

>Dear Steve,
>
>As Clay and you know, we have not yet fully fulfilled the terms of the agreement.  We have until July 24 to do that.  Therefore, since the agreement we have signed requires confidentiality, our attorney has advised me that my appearance at the meeting and/or answering any questions with regard to our agreement would be a violation of the agreement and put us in an untenable position.
>
>Therefore, I will be unable to attend the meeting. . . .

(Rawhouser Dec., Ex. B.)

DeWeese held its annual meeting on June 29, 2006, and Schwendiman did not attend.  (See Rawhouser Dec. ¶ 7; Schwendiman Dec., Ex. 2.)  Rawhouser states that "the possibility of a transaction with [Ethanol Capital] was discussed [at the meeting,] but no action was taken by the Members to approve or disapprove such a transaction."

5

(Rawhouser Dec. ¶ 7.)

On July 16, 2006, Ethanol Capital submitted a request for due diligence materials to DeWeese and Republican Valley. (Rawhouser Dec. ¶ 8; see also Rawhouser Dec., Ex. C.) Additional requests and responses to the requests were exchanged over the next several days. (See Rawhouser Dec. ¶ 8; Schwendiman Dec. ¶¶ 13-15; Schwendiman Dec., Ex. 1-4.) On July 19, 2006, Ethanol Capital's counsel forwarded to DeWeese and Republican Valley "drafts of a Bill of Sale and Assignment for all of the assets of DeWeese and Republican Valley." (Schwendiman Dec. ¶ 16; see also Rawhouser Dec. ¶ 9.) In the days that followed, the parties exchanged information and worked to revise the drafts. (See Schwendiman Dec. ¶ 16; Rawhouser Dec. ¶ 9.)

On July 24 and 25, the defendants' managers "circulated written consent ballots" to the members of DeWeese and Republican Valley to gauge their approval of the transaction with Ethanol Capital. (Rawhouser Dec. ¶ 11.) The members rejected the transaction unanimously. (See id.)

On July 25, 2006, before 5:00 p.m., an affiliate of Ethanol Capital executed a "Bill of Sale and Assignment agreement and provided the executed document to DeWeese and Republican Valley." (Schwendiman Dec. ¶ 16; see also Compl., filing 1, Ex. B.) DeWeese and Republican Valley then informed Ethanol Capital that their members disapproved of the MOU and the Bill of Sale and Assignment. (Schwendiman Dec. ¶ 17.) At approximately 7:45 p.m., Rawhouser and Clabaugh, "as co-managers of [DeWeese] and [Republican Valley], signed letters of intent to enter into a transaction to sell the units of [DeWeese] and [Republican Valley] to another entity at a purchase price in excess of the purchase price in the MOU." (Rawhouser Dec. ¶ 13.)

On July 26, 2006, Ethanol Capital filed a complaint against DeWeese and Republican Valley, seeking specific performance of the terms of the MOU. (See Compl., filing 1.) It also filed a motion for a temporary restraining order to prevent DeWeese and Republican "from selling, assigning, transferring, or otherwise disposing of any or all of

6

the assets of the Defendants to any party other than [Ethanol Capital]." (See filing 3.) My analysis of this motion follows.

## II. STANDARD OF REVIEW

In Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc), the Eighth Circuit clarified the factors that must be applied by district courts when considering motions for preliminary injunctions: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." These factors are also applied to resolve motions for temporary restraining orders. See, e.g., Morgan v. Morgan, 289 F. Supp. 2d 1067, 1069 (N.D. Iowa 2003).

Although the Eighth Circuit counsels that "no single factor is determinative," Dataphase Sys., Inc., 640 F.2d at 113, the absence of a threat of irreparable harm is fatal to the movant's position, see id. at 114 n.9. On the other hand, the absence of a mathematical probability that the movant will prevail on the merits can be overcome if the remaining factors weigh strongly in his favor. In other words, a movant need not always "prove a greater than fifty per cent likelihood that he will prevail on the merits." Dataphase Sys., Inc., 640 F.2d at 113.

> The very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test. At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case.

Id. (footnote omitted).

### III. ANALYSIS

My analysis of each of the four <u>Dataphase</u> factors is set forth below.

**A. The Probability that Ethanol Capital Will Succeed on the Merits of its Specific Performance Claims**

Ethanol Capital argues first that a temporary restraining order is appropriate because its claims against the defendants are likely to succeed. (<u>See</u> Pl.'s Br., filing 6, at 9-16.) However, gaps and conflicts in the evidence prevent me from making a reasonably accurate assessment of Ethanol Capital's probability of success.

As Ethanol Capital correctly notes, "The first requirement [for specific performance] is the existence of a valid, legally enforceable contract." (Pl.'s Br., filing 6, at 9 (quoting <u>Sayer v. Bowley</u>, 503 N.W.2d 166, 169 (Neb. 1985)).) Ethanol Capital's arguments that the MOU is a valid and enforceable contract focus upon Clabaugh's, Rawhouser's, and Maynard's authority to agree to the sale of the defendants' assets. Specifically, Ethanol Capital refers me to evidence showing that: 1) since the combined interests of Clabaugh, Rawhouser, and Maynard amount to a majority of the capital interest in DeWeese, these individuals had the authority to sell all of DeWeese's assets; 2) Clabaugh and Rawhouser had the authority to sell all of the assets of DeWeese and Republican Valley pursuant to the companies' operating agreements, which provide that the managers have the authority to sell all of the companies' assets without an affirmative vote of the members if the sale is in the "ordinary course of the Company's business"; 3) Clabaugh and Rawhouser represented to Schwendiman that they had the authority to sign the MOU on behalf of the defendants and that the sale need not be approved by the members; and 4) the sale was in fact approved by the members of both DeWeese and Republican Valley at the June 29, 2006, annual meeting. (<u>See</u> <u>id.</u> at 10-13.) Although Ethanol Capital might ultimately prove to be correct on each point, its arguments are hampered by the incompleteness of the record and by disputes in the evidence.

First, although there is some evidence concerning Clabaugh's, Rawhouser's, and

Maynard's initial investments in DeWeese, (see Schwendiman Dec., Ex. 1), it is not clear that these investments represent their current "capital interests" for the purposes of member voting.  Nor is there any evidence that Clabaugh, Rawhouser, and Maynard own a majority of the "capital interests" in Republican Valley.  In short, it is not clear that Clabaugh, Rawhouser, and Maynard own a majority of the interest in either of the defendant companies, such that they could approve the sale by an affirmative vote. Second, although it is true that the operating agreements for DeWeese and Republican Valley authorize Clabaugh and Rawhouser, as managers of the defendant companies, to sell all of the companies' assets without an affirmative vote of the members "with respect to any sale or disposition of the Compan[ies'] assets in the ordinary course of the Compan[ies'] business," (see Schwendiman Dec., Ex. 3), the "ordinary course" of the defendants' business is murky at best.  In other words, I cannot conclude one way or the other whether the sale proposed in the MOU was within the "ordinary course" of DeWeese's and Republican Valley's business.  Third, although Schwendiman claims that he was told that the approval of the members of DeWeese and Republican Valley was not necessary, Rawhouser claims that Schwendiman was told precisely the opposite. (Compare Schwendiman Dec. ¶ 10 with Rawhouser Dec. ¶ 6.)  I have no means of resolving this inconsistency at the present time.  Finally, although it is possible that the members of DeWeese and Republican Valley approved of the terms of the MOU during their annual meeting, the minutes of that meeting do not describe any such action with particularity.  (See Schwendiman Dec., Ex. 2.)  Furthermore, Rawhouser denies that the terms of the MOU were discussed, but not approved, at the meeting.  (See Rawhouser Dec. ¶ 7.)

     In sum, although Ethanol Capital may ultimately prove each of the foregoing assertions, the evidence now before me is contested and fragmented, and it does not allow me to assess, with any reasonable degree of confidence, whether Ethanol Capital can prevail on its claims.

For its part, the defendants argue vehemently that the MOU does not amount to an enforceable contract under Nebraska law. (See, e.g., Defs.' Br. at 5-15.)

> Under Nebraska law, to "establish an express contract, there must be a definite proposal and an unconditional and absolute acceptance thereof." See Viking Broad. Corp. v. Snell Publ. Co., 243 Neb. 92, 497 N.W.2d 383, 385-86 (Neb. 1993). In addition, there must be a meeting of the minds "at every point; nothing can be left open for future arrangement." Cimino v. Firstier Bank, N.A., 247 Neb. 797, 530 N.W.2d 606, 614 (Neb. 1995). "A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement." Neb. Nutrients, Inc. v. Shepherd, 261 Neb. 723, 626 N.W.2d 472, 499 (Neb. 2001). Although the parties' intent to be bound by the contract is a determinative factor in establishing the existence of a contract, the requisite intent is determined by the parties' objective manifestation, not by the parties' subjective intent. See Viking, 497 N.W.2d at 385-86. The party seeking the establishment of a contract has the burden of proving the existence of a definite offer and an unconditional acceptance. Sayer v. Bowley, 243 Neb. 801, 503 N.W.2d 166, 169 (Neb.1993).

(Defs.' Br. at 5 (quoting Connolly v. Clark, No. 8:04CV136, 2005 WL 2042307, at *2 (D. Neb. Aug. 23, 2005)) (emphasis omitted).) Seizing mainly upon the requirement that "nothing can be left open for future arrangement," the defendants assert that the MOU did not amount to an express contract because: 1) the MOU contained ambiguities; 2) the MOU indicated that a "definitive agreement" would be completed in the future; 3) the parties did not complete negotiations concerning the terms of a definitive agreement; 4) the drafts of the definitive agreement contained new terms that did not appear in the MOU; and 5) the defendants' members did not approve the transaction. (Defs.' Br. at 9-15.) However, just as the plaintiff's arguments suffer from a lack of clarity in the record, it seems to me that the defendants' arguments too cannot be resolved in the absence of further evidentiary development. For example, at this time 1) the matters covered during the April 25 meeting are in dispute; 2) it is unclear whether any additional approval of the transaction terms was contemplated or required before the deal could proceed; 3)

10

although the MOU did contemplate the execution of a "definitive" agreement, the MOU states that this agreement was to be "consistent with" the terms of the MOU, states clearly and unambiguously the parties' intent to be bound by the MOU, and suggests that the defendants' obligation to execute the "consistent," "definitive" agreement was unconditional; 4) there is not specific, undisputed evidence of any contract terms that remained to be resolved after the MOU was executed; 5) since the July 19 draft agreement is not in evidence, I cannot say whether it contained any terms that were inconsistent with the MOU; and 6) since the substance "numerous telephone conversations, email messages and correspondence" that appeared in the wake of the July 19 draft agreement are not in evidence, I cannot determine whether the parties were engaged in negotiations concerning terms that were not contained in or inferred from the MOU, or, if so, which party insisted upon the new terms. Under these circumstances, the probability that the defendants will ultimately prevail remains unclear.

In sum, although I am mindful that the plaintiff's burden of establishing a likelihood of success on the merits is not necessarily onerous, see Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981), I must conclude that Ethanol Capital has not met its burden. This is not to say that the plaintiff cannot prevail in this case. On the contrary, Ethanol Capital's ultimate eligibility for specific performance remains an open question. However, given the gaps in the record, Ethanol Capital has failed to convince me that its probability of ultimate success justifies the entry of a temporary restraining order or preliminary injunction at this time.[2]

---

[2] I wish to note that, although I feel that the record is not sufficiently developed to allow me to evaluate the probability that the plaintiff will succeed on the merits, counsel have done an exceptional job in preparing this case on extremely short notice. In particular, I found their oral arguments and briefs to be well-organized and very helpful.

### B. The Threat of Irreparable Harm to Ethanol Capital

As I noted above, Ethanol Capital's inability to convince me that it is likely to succeed in the merits might be overcome if "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981). However, in this case I am not convinced that the plaintiff will suffer irreparable harm if a temporary restraining order is not entered.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 425 (8th Cir. 1996). Here there is evidence that ethanol plant construction is booming, that Fagen is the preferred ethanol plant contractor, and that Ethanol Capital cannot obtain a construction slot dated prior to 2010 by approaching Fagen directly. There is also evidence that the defendants have already signed a "letter of intent" to sell their assets to another entity. However, it is not clear that the defendants will execute a transaction with this new entity prior to the resolution of this lawsuit, particularly in view of the chance that the defendants will be found liable for breaching the terms of the MOU.[3] Also, it is apparent that there is an "after- market" for Fagen construction slots, and even if the defendants do sell their assets to a third party prior to the resolution of this case, I am not convinced that Ethanol Capital cannot cover the defendants' breach by obtaining new slots–or perhaps even the very same slots at issue in this case–and proceeding against the defendants to collect damages.[4]

---

[3] I note parenthetically that there is also no evidence that this "letter of intent" is binding upon the defendants.

[4] Although options to purchase parcels of land suitable for the construction of these plants were to be included in the transaction, and although damages are typically deemed "inadequate" when contracts for the sale of land are breached, see, e.g., Restatement (Second) of Contracts § 359 illus. 1 (1981); O'Hagan v. United States, 86 F.3d 776, 783 (8th Cir. 1996) ("[M]onetary relief fails to provide adequate compensation for an interest in real property, which by its very

In sum, the plaintiff has failed to persuade me that if a temporary restraining order or preliminary injunction is not granted, great harm is imminent and certain to occur.

### C. The State of the Balance Between the Harm Confronting Ethanol Capital and the Injury that Granting the Injunction Will Inflict on Other Parties Litigant

In view of my conclusion that Ethanol Capital has failed to establish a threat of irreparable harm, there is no need to balance the harm confronting the plaintiff against the injury that the entry of a temporary restraining order would inflict upon the defendants.

### D. The Public Interest

It seems to me that the public interest does not weigh strongly in favor of or against the issuance of a temporary restraining order in this case. Ethanol Capital suggests that a restraining order would serve "the public's interest in enforcing contractual obligations and . . . in developing renewable energy." (Pl.'s Br., filing 6, at 18.) First, while I agree that the public has a general interest in the enforcement of valid contracts, see, e.g., American Airlines, Inc. v. Wolens, 513 U.S. 219, 247 (1995) (O'Connor, J., concurring in part and dissenting in part) (quoting Cohen, The Basis of Contract, 46 Harv. L. Rev. 553, 562 (1933)), in this case it is not yet clear that the plaintiff is entitled to specific performance of the terms of the MOU. Second, the public's interest in renewable energy will not necessarily be thwarted if DeWeese and Republican Valley sell their Fagen construction slots to someone other than the plaintiff. Therefore, I am not persuaded that the public's interest in the outcome of this matter favors the imposition of a temporary restraining order.

---

nature is considered unique."), it is clear that in this particular case the Fagen slots are of primary importance, and there is no indication that the particular parcels involved are especially desirable or unique in any meaningful way. Indeed, based on the evidence now before me, it is not certain that the plaintiff intended to exercise the options. I do not mean to suggest, however, that the fact that the land options seem to be of secondary importance will interfere with the plaintiff's ability to obtain specific performance if it prevails in this litigation.

In conclusion, I find that the balance of the equities in this case does not warrant the entry of a temporary restraining order or a preliminary injunction. It is difficult to gauge the probability that the plaintiff will succeed on the merits using the evidence now before me, and, more importantly, I am not convinced that the failure to enjoin the defendants will result in certain, irreparable harm to the plaintiff.

**IT IS ORDERED** that the plaintiff's motion for a temporary restraining order, filing 3, is denied.

Dated August 1, 2006.

> BY THE COURT
>
> s/ Warren K. Urbom
> United States Senior District Judge